IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MIKAYLA MARIE SHIVELY, | ) | CASE NO.  4:24-CV-01341-DAP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER    OF    SOCIAL SECURITY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Mikayla Shovely ("Plaintiff" or "Shively"), challenges the final decision of Defendant, Leland Dudek,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED.

## I.    PROCEDURAL HISTORY

In May 2022, Shively filed an application for SSI, alleging a disability onset date of April 7, 2004 and claiming she was disabled due to short term memory loss, anxiety, depression, ligamentous laxity, apraxia of speech, dyspraxia, learning disorder, insomnia, thyroid issues, heart racing, and shortness of breath. (Transcript ("Tr.") 17, 63.)  The application was denied initially and upon reconsideration, and Shively requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 17.)

---

[1] On February 19, 2025, Leland Dudek became the Acting Commissioner of Social Security.

On August 1, 2023, an ALJ held a hearing, during which Shively, represented by counsel, her mother, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 27, 2023, the ALJ issued a written decision finding Shively was not disabled.  (*Id.* at 17-27.)  The ALJ's decision became final on June 6, 2024, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On August 5, 2024, Shively filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7-9.)  Shively asserts the following assignment of error:

> (1) The ALJ's RFC determination is the product of legal error because the ALJ failed to properly evaluate the supportability and consistency of the medical opinion of Dr. Suzanne Savickas pursuant to 20 C.F.R. § 416.920c(b)(2), frustrating the Court's ability to meaningfully review whether the ALJ's decision is supported by substantial evidence.

(Doc. No. 7.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Shively was born in April 2004 and was 19 years-old at the time of her administrative hearing (Tr. 17, 26), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c). She has at least a high school education.  (Tr. 26.)  She has no past relevant work.  (*Id.*)

### B.   Relevant Medical Evidence[2]

On February 10, 2022, Shively and her mother saw Erin E. Gibson, LISW, regarding "care transitions" once Shively turned 18. (*Id.* at 451.)  Shively's mother reported that Shively's "situation is unique because she is very smart and is a 4.0 student, but because of her apraxia has major problems with short term memory."  (*Id.* at 452.)  Shively's mother further reported Shively "has difficulty remembering

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Shively challenges only the ALJ's findings regarding her mental limitations, the Court further limits its discussion of the evidence to Shively's mental impairments.

and even knowing to write down something important if it is discussed on the phone." (*Id.*)

On March 22, 2022, Shively saw Basem Doss, M.D., for a three-month follow up appointment with labs. (*Id.* at 384.) Shively's mother reported worsening anxiety and depression, although an increased dose of Sertraline had helped. (*Id.* at 387.) Shively's gynecologist had also been adjusting her hormones, thinking her hormone levels were affecting Shively's mood. (*Id.*) Shively recently started new birth control pills and wanted to give them time to see if they helped. (*Id.*) Shively's mother told Dr. Doss that Shively had been very fatigued and sleeping up to 15 hours a day. (*Id.*) On examination, Dr. Doss found Shively "active and alert" with normal mood and good judgment. (*Id.*) Dr. Doss continued Shively's medications. (*Id.* at 388.)

At a May 2022 appointment at the Cleveland Clinic genetics clinic, Shively and her mother informed Aditi Yadav, M.D., that Shively "was home-schooled with an IEP and graduated high school with a 4.0 GPA with extensive accommodations." (*Id.* at 432.)

On June 21, 2022, Shively saw Dr. Doss for follow up. (*Id.* at 378.) Shively complained of depression. (*Id.*) Dr. Doss noted Shively had "longstanding issues with apraxia, dysplasia of limbs and poor short-term memory." (*Id.*) Dr. Doss further noted Shively also had "longstanding anxiety and depression associated with her health issues." (*Id.*) On examination, Dr. Doss found Shively "active and alert" with normal mood and good judgment. (*Id.*) Dr. Doss noted Shively was stable and continued her medications. (*Id.* at 383.)

On July 13, 2022, Shively underwent a neuropsychological evaluation with Ana Arenivas, Ph.D., MPH. (*Id.* at 512.) Shively and her mother reported concerns regarding "ongoing problems with short and long term memory." (*Id.*) Both told Dr. Arenivas that Shively forgot days of the week and months, forgot right from left, and forgot letters. (*Id.* at 513.) Shively struggled to follow directions and stated her visual memory was better than her auditory/verbal memory. (*Id.*) Dr. Arenivas noted Shively's

"[m]emory concerns have generally been stable." (*Id.*)  Shively also endorsed trouble focusing "when hearing two or more stimuli at the same time." (*Id.*)  Shively reported recently graduating high school from the Ohio Virtual Academy homeschool program. (*Id.*)  She received special education supports through an IEP under the disability category of Specific Learning Disability. (*Id.*)  Shively related a history of anxiety; she was taking Sertraline, which reduced her anxiety "significantly." (*Id.*)  Shively told Dr. Arenivas she took a while to think things through and that she benefitted "from a great deal of structure." (*Id.* at 514.)

On examination, Dr. Arenivas found Shively polite, cooperative, and pleasant, with no obvious word finding difficulties. (*Id.*)  Shively demonstrated "some internal distractibility but [her] behavior was well-regulated and she worked diligently." (*Id.*)  Dr. Arenivas found Shively "exhibited sufficient attention/concentration, engagement, and cooperation." (*Id.*)  Regarding Shively's attention and executive functions, Dr. Arenivas found as follows:

- Shively "sometimes appeared internally and externally distracted." (*Id.* at 515.) Performance-based testing revealed variable attention, which Dr. Arenivas found to be "a clear area of weakness." (*Id.*)  Shively's "simple (brief) auditory attention was in the moderately low range and her brief visual attention and scanning ranged from low average to extremely low." (*Id.*)  Her "sustained visual attention performance was characterized by multiple errors of omission (missed targets) and commission (incorrectly identified targets) as well as variability and slowed responding as the task progressed." (*Id.*)

- Shively "appear[ed] to be demonstrating attentional and executive function difficulties consistent with an attention disorder which are likely exacerbated by symptoms related to her apraxia, dysautonomia, and possible EDS." (*Id.*)

Dr. Arenivas further found demonstrated weakness in processing speed, and noted Shively was "at risk for struggling on more complex tasks," especially with time constraints. (*Id.*)  Dr. Arenivas opined:

Although memory performance was intact, the impact of her weaknesses on her consistent recall of information likely makes it difficult for her to demonstrate all that she knows.  It is highly important for those working with Mikayla to understand that, given her history, there may be considerable variability in her presentation from day to day that is beyond her control and

> not "visibly" apparent.  Additionally, Mikayla has many strengths, but that should not be interpreted to mean that she is not struggling internally to perform as well as she does.
>
> * * *
>
> While Mikayla may be able to allocate the resources to perform some tasks fairly fluently and well, she may also struggle to maintain the cognitive energy to do so.  Given her apraxia and associated fatigue, this may occur at many points during the school day when her mental resources are exhausted, which may result in variable performance. . . . Mikayla experiences fatigue and discomfort related to her medical conditions, which may also contribute to problems consistently focusing and attending to information necessary for efficient processing and encoding.   As Mikayla progress [sic] in life, challenges such as she experiences may impact her ability to perform to a greater degree as demands and expectations increase.

(*Id.* at 516.)

Shively's diagnoses included adjustment disorder with mixed anxiety and depressed mood, attention and concentration deficit, and other symptoms and signs involving the nervous system.  (*Id.* at 516-17.)  Dr. Arenivas recommended several accommodations and supports for Shively's academic needs, including additional time for task completion and the ability to take breaks as needed.  (*Id.* at 517-18.)

On July 21, 2022, Shively saw Michael Maggio, PMHNP-BC, to establish care and for increased symptoms of depression and anxiety.  (*Id.* at 527-29.)  Shively and her mother reported a history of depression and anxiety, and both said Shively was experiencing an increase in depressive symptoms.  (*Id.* at 529.)  Shively had switched birth control medication, she was sleeping around 15 hours, and she would wake up and cry.  (*Id.*)  Both reported Shively struggled with short term memory loss.  (*Id.*)  Shively could not write, but she could type.  (*Id.*)  Shively also struggled with distractibility.  (*Id.*)  Shively told Maggio that "she would become very distracted and overwhelmed when she attempted to get a job."  (*Id.*)  On examination, Maggio found Shively adequately groomed with a moderately anxious, moderately depressed, and mildly irritable mood, consistent affect, normal speech, alert and cooperative behavior, full orientation, fair judgment and insight, and normal thought process and content.  (*Id.* at 530.)  Maggio

increased Zoloft from 125 mg to 150 mg.  (*Id.* at 529.)  Shively's diagnoses consisted of major depressive disorder, recurrent episode, moderate, generalized anxiety disorder, and panic disorder.  (*Id.*)

On September 22, 2022, Shively saw Dr. Doss for follow up.  (*Id.* at 643, 647.)  Shively reported having undergone a neuropsychiatric examination, where it was thought Shively had attention deficit disorder.  (*Id.* at 647.)  Shively's mother disagreed and felt the problems went deeper than this.  (*Id.*) Shively reported starting on buspirone and decreased Zoloft, and that she was doing well on this combination.  (*Id.*)  Shively told Dr. Doss she had started school and was taking a full course load, so she had been unable to attend physical therapy lately.  (*Id.*)  Shively reported doing well overall.  (*Id.*)

On January 10, 2023, Shively underwent an Adult Diagnostic Evaluation with Suzanne Savickas, Ph.D., LPC.  (*Id.* at 744.)  Shively's mother told Dr. Savickas that she wanted to provide the information because of Shively's memory issues.  (*Id.*)  Shively reported cognitive, memory, speech, and mobility issues.  (*Id.*)  She endorsed sadness, tearfulness, hopelessness, isolation, loss of activities, intermittent insomnia, sensory issues, and difficulty focusing.  (*Id.* at 745.)  Shively told Dr. Savickas she was a sophomore at Kent State.  (*Id.* at 748.)  Shively's strengths included creativity, writing, "obscure trivia," and public speaking.  (*Id.*)  On examination, Dr. Savickas found normal speech, average intelligence, logical thought process, normal abstract reasoning, normal thought content, fair insight and judgment, and normal and appropriate mood.  (*Id.* at 745.)  Dr. Savickas recommended psychotherapy every two weeks and continuing to see Maggio for medication management.  (*Id.* at 751.)  Shively's diagnoses consisted of major depressive disorder, recurrent episode, moderate and generalized anxiety disorder.  (*Id.*)

On February 22, 2023, Shively saw Dr. Savickas for follow up.  (*Id.* at 720.)  Shively reported being stressed over increased fatigue, and while she had been a little short-tempered, her mood had been depressed and she had mostly been crying.  (*Id.* at 721.)  On examination, Dr. Savickas found Shively alert, relaxed, and friendly, with normal, appropriate, and cooperative behavior, well-articulated speech,

normal and appropriate mood, consistent affect, coherent and organized thought process, and normal and appropriate thought content.  (*Id.* at 724.)

That same day, Shively saw Maggio for follow up.  (*Id.* at 657.)  Shively rated her anxiety as a 4-5/10 and her depression as a 5-6/10.  (*Id.*)  She reported her panic attacks had decreased and her depression had improved with the increase in Zoloft.  (*Id.*)  Shively said she felt that she was doing well, but she didn't want to go anywhere.  (*Id.*)  She did not have any friends in the area, and she felt isolated.  (*Id.*)  Both Shively and her mother felt Shively had been more irritable and agitated in the past two weeks.  (*Id.*)  Both Shively and her mother reported Shively struggled with concentration and focus at times, although Shively would not get up until her work was done.  (*Id.*)  Both stated that Shively operated off a checklist.  (*Id.*)  On examination, Maggio found Shively adequately groomed with a moderately anxious, moderately depressed, and mildly irritable mood, consistent affect, normal speech, alert and cooperative behavior, full orientation, fair judgment and insight, and normal thought process and content.  (*Id.* at 658.)

On March 29, 2023, Shively saw Maggio for medication management.  (*Id.* at 759-60.)  Shively reported increased anxiety since her last appointment.  (*Id.* at 760.)  Her biggest stressor was school.  (*Id.*)  Shively rated her depression as mild to moderate, although it increased when she thought about school.  (*Id.*)  Shively told Maggio she did not want to do her schoolwork; while she was good at school, she hated it.  (*Id.*)  Shively reported her anxiety and depression had remained manageable overall since her last session.  (*Id.* at 761.)  Maggio continued Shively's medications.  (*Id.*)

On or about July 18, 2023, Dr. Savickas completed a Mental Medical Source Statement and opined Shively had marked limitations in the following abilities: perform and complete work tasks in a normal work day or week at a consistent pace; maintain attention and concentration for more than brief periods of time; perform at production levels expected by most employers; respond appropriately to changes in the work setting; and tolerate customary work pressures.  (*Id.* at 773-75.)  Dr. Savickas further opined Shively

had an extreme limitation in her ability to remember locations and workday procedures and instructions. (*Id.* at 774.)  Dr. Savickas further opined Shively's condition was likely to deteriorate under stress "due to lack of experience on a job and past academic stress and pressure increasing her mental health symptoms." (*Id.* at 775.)  In response to an invitation to note any other work-related limitations, Dr. Savickas wrote that Shively "demonstrates difficulty with memory and processing recall in addition to her physical limitations/barriers."  (*Id.*)

### C.    State Agency Reports

On September 23, 2022, David Dietz, Ph.D., reviewed the file and determined Shively had mild limitations in her ability to understand, remember, or apply information and interact with others.  (*Id.* at 67-68.)  She had moderate limitations in her ability to concentrate, persist, or maintain pace and adapt or manage herself.  (*Id.*)  Dr. Dietz stated, "Despite Clmt's allegations of problems with comprehension and memory she gradated [sic] high school with a 4.0 and is attending college. While accommodations may be present in these environments, nevertheless she still has to perform the required coursework to satisfaction. FSIQ = 104 (2009) FSIQ = 83 (2015), Brief IQ = 96 (2018), FSIQ = 103 (2022)."  (*Id.* at 71.) Dr. Dietz opined Shively could "[s]ustain attention, concentration, effort, and pace for 1 to 4 step tasks requiring little independent judgment and involving minimal variations and doing so at a requisite schedules of work and breaks."  (*Id.*)  Dr. Dietz further opined Shively could "[a]dapt adequately to situational conditions and changes with reasonable support and structure."  (*Id.*)

On November 26, 2022, on reconsideration, Aracelis Rivera Castro, Psy.D., affirmed Dr. Dietz's findings.  (*Id.* at 79, 83.)

### D.    Hearing Testimony

During the August 1, 2023 hearing, Shively testified to the following:

- She attends Kent State Trumbull branch.  (*Id.* at 39.)  She wasn't sure how many classes she was taking in the fall.  (*Id.* at 41.)  She did not remember the coding

classes she had taken last semester.  (*Id.*)  She has had all online classes and open-book studies.  (*Id.* at 43.)  She forgets that she's done an assignment, so her mom writes her a list of all of the assignments and projects she needs to do, and she checks them off when she has completed them so she can keep track.  (*Id.*)  Her grades in college are still good.  (*Id.* at 44.)  She still has around a 4.0.  (*Id.*)  She does everything online.  (*Id.* at 46.)  She tries to ensure she doesn't have any classes that require writing on paper.  (*Id.*)  Her school days are long, and her mom helps keep her on track.  (*Id.*)  She spends 10 hours a day, including breaks, on school.  (*Id.* at 47.)  She does everything at her own pace.  (*Id.*)  She tries not to take breaks.  (*Id.*)  She falls asleep at the keyboard as she is trying to work.  (*Id.*)  She cries a lot.  (*Id.*)

- She lives with her mom, dad, and brother.  (*Id.* at 39.)  She spends most of her day in bed.  (*Id.* at 44.)  She rides with her mom in the car to pick up curbside grocery orders.  (*Id.* at 48.)  She does not go in the store often.  (*Id.*)  She feeds the cats they have.  (*Id.*)  She tries to help with the dishwasher sometimes, although she ends up sick from standing.  (*Id.*)

- She needs things re-explained to her a lot.  (*Id.* at 41.)  She has racing thoughts multiple times a day.  (*Id.* at 45.)  She needs reminders to care for her personal hygiene.  (*Id.* at 50.)

- She had a job at Dairy Queen for two days.  (*Id.* at 42.)  It was too loud, and she was unable to remember the instructions.  (*Id.*)  She had two or three anxiety attacks per day in the two days she worked there.  (*Id.*)

- She did not think she could do a three to four step job with written instructions, especially if it needed to be done a certain way or in a certain order.  (*Id.* at 43.)  She needed total silence when she underwent standardized testing in school.  (*Id.*)  She had to be in a separate room where she would be for five hours crying.  (*Id.*)  She could follow detailed instructions, but the environment contributes to her ability; she can barely read if someone else is talking.  (*Id.* at 43-44.)

During the August 1, 2023 hearing, Shively's mother testified to the following:

- Her daughter is very smart, she just cannot remember things.  (*Id.* at 51.)  Caring for Mikayla is a full-time job.  (*Id.* at 52.)  She spends hours getting Mikayla organized, keeping her on task, and making sure she's doing the right project.  (*Id.*)  When she tried to let Mikayla be more independent with her schoolwork, Mikayla picked a project she had spent all day on and redid it three times with no memory of doing it before.  (*Id.*)  She is constantly looking over Mikayla's shoulder.  (*Id.*)  Mikayla understands her work and completes it herself, she just cannot retain it.  (*Id.* at 53.)  It's like the movie Groundhog Day.  (*Id.*)

- If Mikayla had a job with a simple written instruction, it would need to be explained to her how to do the job daily.  (*Id.*)  She would have the same questions from day one to day two to day three.  (*Id.*)

9

The VE testified Shively had no past relevant work. (*Id.* at 58.) The ALJ then posed the following hypothetical question:

> If you could assume a hypothetical individual of the Claimant's age and education with no past work, and further assume this individual would be limited to light work, specifically lifting and carrying occasionally 20 pounds and frequently 10 pounds, with sitting, standing and walking for up to six hours of the workday, push and pull as much as she can lift and carry, with the additional limitations of only frequently climbing ramps and stairs, never climbing ladders, ropes or scaffolds, frequently stoop, kneel and crouch, occasionally crawl, never unprotected heights, never any moving mechanical parts, and limited to perform simple, routine tasks, and limited to tolerating only occasional changes in a routine work setting, can this hypothetical individual perform other work?

(*Id.*)

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping cleaner, merchandise marker, and routing clerk. (*Id.* at 59.)

The ALJ modified the hypothetical to add only occasional interaction with the public. (*Id.*) The VE testified that the previously identified jobs would remain. (*Id.* at 60.)

The ALJ further modified the hypothetical to add that in addition to verbal instructions, instructions for these simple, routine tasks would need to be written down. (*Id.*) The VE testified this would be considered an accommodation in unskilled work, and if it's an accommodation, it's not considered competitive employment. (*Id.*) Therefore, this limitation would be work preclusive. (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate

10

that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.   20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since May 10, 2022, the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairments: Ataxia with Hypermobility; Anxiety; Short-term Memory Loss; Depression; and Panic Disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: The claimant can lift 20 pounds occasionally and 10 pounds frequently; carrying 20 pounds occasionally and 10 pounds frequently; sitting for 6 hours; standing for 6 hours; walking for 6 hours; and push/pull as much as can lift/carry. She can frequently climb ramps and stairs and never climb

ladders, ropes, or scaffolds. She can stoop frequently, kneel frequently, crouch frequently, and crawl occasionally. She can never work at unprotected heights and never around moving mechanical parts. The claimant is able to perform simple, routine tasks and she is able to tolerate few changes in a routine work setting.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.   The claimant was born on April **, 2004, and was 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since May 10, 2022, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-27.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the

13

Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her sole assignment of error, Shively argues the ALJ's RFC determination "is the product of legal error and therefore not supported by substantial evidence because the ALJ failed to properly evaluate the opinion of Dr. Suzanne Savickas, frustrating the Court's ability to determine if the ALJ's decision is supported by substantial evidence."  (Doc. No. 7 at 13-14.)  Shively maintains the ALJ failed to discuss the supportability or the consistency of Dr. Savickas' opinion "with the medical record as a whole, requiring remand."  (*Id.* at 15.)  Shively maintains the basis for the ALJ's rejection of Dr. Savickas' opinion is unclear, "as no supportability analysis was conducted prior to finding the opinion only partially persuasive."  (*Id.* at 16.)  Shively also implies the ALJ improperly cherry-picked the record and failed to build an accurate and logical bridge between the evidence and the rejection of Dr. Savickas' opinion, as the ALJ noted normal thought content and logical thought processes while ignoring the findings of difficulty with speech and impaired memory.  (*Id.*)  Shively argues that "[t]he ALJ provided no other discussion of Dr. Savickas' records, leaving the Court to merely guess as to why Plaintiff's marked-to-extreme limitations should be rejected."  (*Id.*)  In addition, Shively asserts that the reasons provided by the ALJ for rejecting Dr. Savickas' findings of marked to extreme limitations "do not indicate any genuine inconsistency with the record and are not reasons supported with substantial evidence."  (*Id.* at 18.)  Shively maintains that the error is not harmless.  (*Id.* at 20.)

The Commissioner responds that the ALJ evaluated Dr. Savickas' opinion in accordance with the regulations.  (Doc. No. 8 at 6.)  While the ALJ did not use the term "supportability" in her analysis, she

14

was not required to do so – rather, the ALJ must explain whether the opinion was supported by objective medical evidence, and she did so here.  (*Id.* at 7.)  The ALJ discussed Dr. Savickas' treatment records. (*Id.* at 7-8.)  Shively fails to acknowledge that Dr. Savickas only saw Shively three times in the record and had "unremarkable objective findings" at each of these appointments.  (*Id.* at 8.) The Commissioner asserts, "Glaringly, Plaintiff's 'Statement of Facts' completely omits any objective findings from Dr. Savickas because those findings do not support her claim that she's disabled." (*Id.*)  The Commissioner maintains that substantial evidence supports the ALJ's determination that Dr. Savickas' treatment notes did not support her "extreme opinion" regarding Shively's limitations.  (*Id.* at 9.)  The Commissioner further argues that the ALJ found Dr. Savickas' opinion inconsistent with other evidence in the record, including the neuropsychological evaluation.  (*Id.*)  The Commissioner asserts that "[t]he ALJ acknowledged there were also deficiencies noted at this examination." (*Id.*)  The ALJ considered that Shively was homeschooled and had an IEP, and "did not rely solely on Plaintiff's academic activities in discounting Dr. Savickas's opinion." (*Id.* at 10.)  "In sum, despite Plaintiff's protestations otherwise, the ALJ properly discounted Dr. Savickas's opinion because it was not supported by her own examination findings and was inconsistent with other evidence in the record." (*Id.*)

In her reply, Shively argues that the ALJ failed to identify or "cite any specific examination" by Dr. Savickas "that would be related to the limitations opined." (Doc. No. 9 at 1.)  In addition, the decision is unclear as to what portion of Dr. Savickas' opinion was persuasive, what portion was rejected, and why. (*Id.* at 2.)  Shively maintains the Commissioner's response is impermissible *post hoc* rationalization of the ALJ's decision.  (*Id.*)  The Commissioner and the ALJ failed to address the positive findings in Dr. Savickas' treatment notes regarding impaired memory and difficulty with speech.  (*Id.*)  In addition, the Commissioner failed to address Shively's argument that the ALJ overlooked positive findings in Dr. Arenivas' neuropsychological evaluation that were consistent with Dr. Savickas' opinion.  (*Id.* at 3.)

Shively maintains that "meaningful review is frustrated, and the Court is unable to engage in a proper substantial evidence review as there is clear legal error impacting a critical piece of evidence from Plaintiff's own treating source." (*Id.* at 4.)

Since Shively's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(b)(2).

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1)  Source-level articulation.  Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.
>
> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)

(quoting 20 C.F.R. § 416.920c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

In the RFC analysis, in finding Dr. Savickas' opinion partially persuasive, the ALJ found as follows:

> Dr. Suzanne Savickas, CPC, CRC completed mental residual functional capacity on behalf of the claimant in July 2023. She stated the claimant had mild to moderate limitations in social interaction; moderate to marked limitations in sustained concentration and persistence; and mild to extreme limitations in adaptation. She stated the claimant's conditions would likely deteriorate if she was placed under job stress based on lack of job experience and symptoms of stress and anxiety relating to academics. The claimant would not be capable of managing her own funds. Also, the claimant demonstrated difficulty with memory and processing (Exhibit 15F). The undersigned finds the opinions persuasive in part, as this was an acceptable medical and treating source of the claimant. However, based on the claimant's medical evidence and self-reported activities including taking college classes at Kent State with a 4.0 grade point average, normal and appropriate thought content, logical and goal directed thought processes, appropriate and relaxed behavior on examinations, and strong public speaking ability, the claimant has not demonstrated any marked or extreme limitations in functioning (Exhibits 14F, 2-3, 5; *Hearing Testimony* 1:12:48 PM-1:35:34 PM).

(Tr. 25.)

The undersigned finds the ALJ erred in her evaluation of Dr. Savickas' opinion.  First, it is unclear without explanation from the ALJ how the reasons given for discounting Dr. Savickas' opinion undermine Dr. Savickas' opinions regarding Shively's marked to extreme limitations in her abilities to maintain concentration and attention and remember workday procedures and instructions.  As Shively points out, while the ALJ relies on her 4.0 GPA in college to discount Dr. Savickas' opinion, the ALJ fails to mention the extensive accommodations Shively receives from Kent and the assistance Shively receives from her mother.  (*Id.* at 43-44, 46-47, 52-54, 293-94.)  Nor does the ALJ acknowledge Shively's mother's

18

testimony that Shively "is very smart," but "she can't remember things."[5]  (*Id.* at 51.)  In addition, as the ALJ recognized, Shively "operates off a checklist per her mother."  (*Id.* at 20-21.)  Shively's intelligence, normal thought content and thought processes, as well as her relaxed behavior and "strong public speaking ability," have nothing to do with her short-term memory loss or her difficulty maintaining attention and concentration, and without further explanation from the ALJ cannot suffice to undermine Dr. Savickas' opinion.

Furthermore, elsewhere in the opinion, the ALJ found short-term memory loss to be a severe impairment and recognized positive findings relating to concentration, attention, and memory in the neuropsychological evaluation Shively underwent in July 2022.  (*Id.* at 23-24.)  The ALJ fails to explain how this medical evidence undercuts Dr. Savickas' opinion.  *See Simmons v. Saul,* No. 1:19-CV-00745, 2020 WL 60193, at *12 (N.D. Ohio Jan. 6, 2020) ("An explanation of the ALJ's analysis is especially important where, as here, the ALJ seems to deny the existence of the very evidence he recited only paragraphs before by saying the opinion 'is not supported by the record.'")  A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)).

In addition, the ALJ also fails to discuss several other findings supportive of disability in the record.  In the neuropsychological evaluation, Dr. Arenivas found that Shively's "sustained visual attention performance was characterized by multiple errors of omission (missed targets) and commission (incorrectly identified targets) as well as variability and slowed responding as the task progressed."  (*Id.* at 515.)  Dr. Arenivas opined that while Shively "may be able to allocate the resources to perform some

---

[5] The ALJ noted only that Shively's mother testified that Shively "struggles to retain information."  (Tr. 25.)

tasks fairly fluently and well, she may also struggle to maintain the cognitive energy to do so." (*Id.* at 516.)   Nor does the ALJ acknowledge, let alone discuss, the testimony of both Shively and her mother that Shively:

- Needs things re-explained to her a lot.

- Even if Shively had detailed written instructions on how to do something, the environment contributes to her ability to perform the task; if other stimuli are present, she cannot read.

- Shively would ask the same questions on the job from day one to day two to day three.

(*Id.* at 41, 43-44.)  The ALJ's failure to discuss this evidence is even more significant, as the VE testified that providing written instructions for simple routine tasks in unskilled work would be considered an accommodation and would be work preclusive.  (*Id.* at 60.)

It is well established that the ALJ may not ignore or overlook contrary lines of evidence. *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).

Remand is required.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED.

Date: April 9, 2025                             *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge

## OBJECTIONS

     Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).